# Case No. 9,396.

## MEIGS v. SUN MUT. INS. CO.

[17 Hunt, Mer. Mag. 183.]

Circuit Court, S. D. New York. June, 1847.

MARINE INSURANCE—PROPERLY MANNED—END OF VOYAGE—TEMPORARY ANCHORAGE.

[1. The fact that a ship has performed her voyage and arrived at her home port in safety raises a presumption that she had been all the time properly manned and in every respect seaworthy, and it devolves upon insurers of the cargo defending against a suit for loss by fire, to prove that at the time of loss she had not a full complement of men.]

[2. To terminate a risk upon a marine policy insuring a vessel against loss, until she arrived at the port from which she started after her voyage and had been "moored 24 hours in safety," the voyage must have ended by the arrival of the vessel at the port of delivery, and anchoring her with a view to end the voyage at her proper station at that port for the delivery of cargo.]

[3. Merely dropping anchor in the harbor short of the usual anchorage grounds, for temporary purposes, and especially if from necessity or on account of the character of the navigation or of the harbor is not such a mooring.]

This was an action [by Loring Meigs against the Sun Mutual Insurance Company] to recover the amount of a marine policy of insurance, effected on the ship Joseph Meigs, on a whaling voyage from Mattapoisett, Massachusetts. The terms of the policy were, that it was to continue in effect until the vessel arrived at the same port, after her voyage, and had been moored 24 hours in safety. The vessel reached home in November, 1844, and was anchored within a mile and a half of the dock, for the purpose of lightening her, as it was supposed that she drew too much water to proceed to the usual landing place, without first taking out some of her cargo. She was, therefore, kept at anchor, three-quarters of a mile from the wharf, for seven or eight days, during which lighters were employed unloading her; and, while in this position, she took fire from lightning, or some other cause which did not appear, and was totally destroyed, and the insured now seek to recover the amount of their loss. For the defence it was contended that the policy had expired before she was destroyed, as she had arrived at her port of destination, and was safely moored 24 hours before the fire took place, and that, therefore, the insurers were not responsible.

NELSON, Circuit Justice (charging jury). This was an action on a policy of insurance taken out on the Joseph Meigs, a whaling ship, her outfit and tackle, to continue for a limited period of time, until her return, after her cruise and safe arrival, at the same port, and until she was there moored at the wharf 24 hours in good safety. In order to call your attention to the material part of the policy, I will refer to it in its terms, as the whole question depends on a proper understanding of a particular clause, namely, the clause indicating the termination of the voyage and risk. The defendant, on the 24th of September, 1844, at noon, made an insurance on a vessel, at and from Mattapoisett, on a whaling voyage, to continue until said vessel had safely arrived at Mattapoisett, and until moored 24 hours in good safety. This is the material clause on which the whole case hangs, taken in conjunction with the clause, "until the same shall be safely landed." This clause differs materially in respect to the insurance of the ship and cargo. With respect to the ship, the risk ends on the arrival of the same at the port of Mattapoisett, and on being there moored 24 hours in good safety. But as respects the cargo, the risk does not end until the same is safely landed.

In respect to the cargo, the first objection taken to the right of the plaintiff to recover, is that, in point of fact, at the time of the loss—that is, the destruction of the ship and cargo by fire—the vessel was not seaworthy, for the reason that she had not on board a competent number of hands to take care of the

ship, and to keep watch. But the fact that the ship had performed her voyage, and arrived at her home port in safety, for aught that appeared to the contrary, the presumption of fact is that she had been all the time properly manned, and in every respect seaworthy; and, as I apprehend, it devolves on the insurers to prove that at the particular time of the loss, she was not manned with a proper complement of hands. If that fact is established to your satisfaction, it is a sufficient answer to as much of the case as it covers, namely, in respect to her cargo. If not, then the plaintiff is entitled to your verdict on that branch of the case. The main question is in respect to the ship, and, as has been very properly stated by counsel on the trial, the simple question on this branch of the case is, whether this voyage had ended, within the meaning of the clause in the policy, before the loss of the vessel, by destruction from fire.

On the part of the defendant it is insisted that it did, and the plaintiff says that it did not. This clause is inserted in the policy for the purpose of indicating the termination of the voyage, and contains the express stipulations of the parties on the subject. The decision of the case, you will therefore see, involves the necessary and proper understanding of this clause, when applied to the particular voyage in question. Now, as a general rule, I lay down this to be the meaning of that clause, namely, that in order to terminate the risk on the part of the underwriters, by virtue of this clause, the voyage must have ended by the arrival of the vessel at the port of delivery, and the anchoring her at the usual anchorage ground in that port, for the delivery of her cargo. I, of course, refer to the port of delivery in which the voyage is to terminate. The question as to what is the usual anchorage ground, in any given port, is of course a question of fact, and depends on the usage and custom of that port. And several of the witnesses in this case have proved the fact, that every port has its particular anchorage ground. The mere dropping of the anchor in the harbor, short of the usual anchorage ground. for temporary purposes, and especially if from necessity, or on account of the character of the navigation, or on account of the harbor, under the view that I take of the case, proves nothing. It must be a dropping of the anchor for securing the vessel at the end of the voyage, and with a view to end the voyage, and for the purpose of securing the ship in its proper station, in the port of delivery, for the purpose of unloading the cargo. It is for the jury to say whether, in this sense of the policy, the vessel was moored in safety more than 24 hours, and that the policy expired before the destruction of the vessel. I regard the main question as one of fact for the jury to determine, under the instructions I have given you. You will, therefore, say whether, on the whole case, was casting

anchor at the usual place for large vessels, drawing 13 feet of water, with a view to lighten her—was that casting anchor, in the meaning of this clause of the policy, at the usual anchoring ground of that harbor, or was the usual anchoring ground at the wharf, which is the usual place for unloading the cargo?

The jury found a verdict for the plaintiff for $10,500, being the full amount of the policy, subject to liquidation.